J-A26036-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARIA I. SANUTTI-SPENCER | : | |
| | : | |
| Appellant | : | No. 782 MDA 2016 |

Appeal from the Judgment of Sentence December 18, 2015
In the Court of Common Pleas of Columbia County Criminal Division at
No(s): CP-19-CR-0000754-2014

BEFORE: BOWES, J., OLSON, J., and RANSOM, J.

MEMORANDUM BY RANSOM, J.: **FILED JANUARY 11, 2018**

Appellant, Maria I. Sanutti-Spencer, appeals from the judgment of sentence of life in prison without the possibility of parole followed by an aggregate of two hundred fifty months (250) to six hundred ninety-six months (696) of incarceration, imposed December 18, 2015, following a jury trial resulting in her conviction for criminal homicide, criminal solicitation to commit homicide, criminal conspiracy, burglary, receiving stolen property, criminal solicitation to commit burglary, multiple counts of arson, criminal solicitation to commit arson, criminal attempt to commit homicide, terroristic threats, and multiple counts of perjury.[1]  We affirm.

---

[1] **See** respectively, 18 Pa.C.S. §§ 2501; 902(a); 903(a)(1); 3502(a)(2); 3925(a); 902(a); 3301(a)(1)(ii); 902(a); 901(a); 2706(a)(1); and 4902(a).

The relevant facts and procedural history are as follows. Appellant married Frank Spencer ("the Victim") in February 1997. Between 2006 and 2012, the Victim reported approximately twenty-five (25) to thirty-five (35) domestic incidents to the Hemlock Township police department. *See* Notes of Testimony (N.T.), 11/12/2015, at 145. Police records confirm that the Victim reported that Appellant had threatened to kill him on "numerous occasions." *Id.* Following one such occasion, which occurred in October 2006, the Victim filed for divorce. *See id.* at 159.

On May 15, 2007, the Victim reported that Appellant threatened that her Father, Anthony Rocco Franklin ("her Father"), would kill him. *Id.* at 160. Contemporaneous with this report, other testimony established that Appellant sought help from a former coworker, Lee Mix, to secure an early parole for her Father. N.T., 11/12/2015, at 61-62, 65.[2] When Mix and Appellant were coworkers in 2005, Appellant threatened to harm the Victim. *See id.* at 61-64 (Lee Mix testified Appellant threatened to kill the Victim by injecting him with insulin while he was asleep). Appellant also implied that her Father was in the Mafia. *Id.* at 64. Mix informed Appellant that she could not help. *Id.* at 65.

In March 2009, her Father submitted a home plan to the parole board, in which he proposed to live at a residence jointly owned by Appellant and the Victim ("Fairview Drive Residence"). *Id.* at 87-88. Parole agent James Curry

---

[2] At the time, Mix was equal employment opportunity director for the parole board. N.T., 11/12/2015, at 65.

conducted the pre-parole investigation. *Id.* at 85-86. When Curry investigated the proposed home plan, the Victim told Curry that he did not want her Father living at the Fairview Drive Residence because Appellant and the Victim were getting a divorce. *Id.* at 88. Her Father's proposed home plan was denied. *See id.*

In September 2009, her Father's home plan was resubmitted, proposing again to live at the jointly owned residence. Appellant indicated to the parole board investigator that she was divorced and the homeowner. *Id.* at 98-99, 104. Her Father's home plan was approved. However, at the time, the divorce was not final; Appellant and the Victim were subject to an interim divorce order, giving each party the right to live at the Fairview Drive Residence when it was their turn to have custody of the kids. N.T., 11/13/2015, at 52.

Between January 2010 and September 2011, police responded to and/or investigated approximately sixteen incidents specifically involving the Victim and Appellant at the Fairview Drive Residence. *Id.* at 52-53. Appellant threatened to burn down the Victim's new house and threatened to burn down the house of the Victim's girlfriend, Julie Dent. *Id.* at 57-58; *see also* N.T., 11/12/2015, at 167-168 (the Victim's mother heard Appellant threaten to burn down the house "50" times and say her Father was in the Mafia and would have the Victim killed); *id.* at 105-106 (the Victim's lawyer knew the Victim lived in fear based on threats by Appellant to burn down his house and of being killed by her Father). In January 2010, a fire occurred at the Victim's

home. N.T., 11/12/2015, at 107. In August 2010, another fire burned the house of the Victim's girlfriend to the ground. ***See id.***

The evidence presented at trial suggested that the Victim lived in absolute fear of Appellant and her Father. The Victim was very worried that her Father was capable of killing him and that they were threatening to kill him. N.T., 11/13/2015, at 146; N.T., 11/10/2015, at 188. The Victim "was absolutely in fear to the point where he was changing his habits so he wouldn't be going to the bank on the same day." N.T., 11/10/2015, at 187. Appellant expressed anger and hostility toward the Victim following divorce hearings, often concerning custody of their children. ***Id.*** at 185. According to one witness, "on numerous occasions, [Appellant] would fly in the driveway and get out and there would be a screaming match that would ensue." ***Id.*** at 186.

On June 8, 2012, a divorce decree was issued dissolving the marriage and designating the Victim as homeowner of the Fairview Drive Residence. N.T., 11/11/2015, at 43. A police officer helped the Victim compose a no-trespassing letter to Appellant (dated 6/27/2012), telling Appellant to stay off his property except when exchanging custody of their children in the driveway. ***Id.*** at 44; ***see also*** N.T., 11/13/2015, at 61, 63.

On June 30, 2012, news of the divorce appeared in the local paper. On the evening of June 30, 2012, Appellant called the Victim's cousin and warned him that if the Victim's mother moved into the Fairview Drive Residence, Appellant would burn it to the ground; Appellant threatened that "that house

- 4 -

will be her last…. And she can join [the Victim]." N.T., 11/11/2015, at 135. The Victim's cousin immediately reported Appellant's threats to the police. *Id.*

On July 3, 2012, the Victim's body was discovered shot dead in the foyer of the Fairview Drive Residence. N.T., 11/17/2015, 234-236, 237-238. The evidence established that the Victim was shot from a distance as he was entering the house and that no one heard from the Victim between July 1-2, 2012. The Victim was killed by two rapidly fatal gunshot wounds: one to the head and one to the left arm. *Id.* The parties stipulated that the bullet recovered from the Victim's torso was from a .30 caliber class discharged rifle and the bullet recovered from his head/neck was fired from a .38, .357 caliber, or nine-millimeter class handgun. N.T., 11/12/2015, at 31. Blood splatter was found on the interior of the front-door threshold, "indicative of the door being opened when the bloodletting event occurred." N.T., 11/11/2015, 23. Officer Sergeant Brian J. Dropinski found two shell casings near a tree with a Y shape in front of the house. N.T., 11/12/2015, at 36. Officer Droplinski testified that the tree offered support for the firing position and was within firing range of the front door. *Id.* at 38; *see also id.* at 59 (noting distance between perch and house was 115 feet).

Corporal David Andreuzzi found yellow, cleaning gloves at the scene, one on the kitchen floor and one in the kitchen sink. N.T., 11/11/2015, 26, 29, 39. A forensic expert testified that DNA samples recovered from the gloves matched the DNA profile of Appellant. *Id.* at 157-58, 226.

On July 23, 2014, a grand jury issued an indictment, finding probable cause to believe that Appellant and her Father engaged in a series of crimes, culminating in the Victim's murder. On July 28, 2014, Appellant was arrested and charged with twenty-six (26) crimes as described above.[3] On October 30, 2014, Appellant filed a motion for writ of habeas corpus. Following a hearing, Appellant's motion was denied. *See* Order, 1/5/2015. Appellant also filed an omnibus pre-trial motion, including a motion to preclude hearsay testimony. *See* Def.'s Mot. (filed 3/9/2015). Following a hearing, the omnibus motion was denied, except the motion to preclude hearsay testimony was denied without prejudice to Appellant's ability to file motions in limine six weeks before jury selection. *See* Order, 6/22/2015.

In September 2015, the Commonwealth filed a motion to preclude irrelevant evidence related to Appellant's health as well as the Victim's alleged drug abuse and violent propensities. Upon consideration of Appellant's response and following a hearing, the court issued a pre-trial order precluding Appellant from introducing evidence of the Victim's alleged drug abuse and violent propensities. *See* Order, 11/3/2015. In addition, the court denied Appellant's motions in limine.

Following a two-week jury trial, the jury returned a guilty verdict against Appellant on all twenty-six counts on November 20, 2015. On December 18,

---

[3] Appellant's Father fled to Argentina after testifying before the grand jury; however, in April 2017, he was extradited back to Harrisburg to face criminal prosecution.

2015, Appellant was sentenced as described above. Appellant timely filed a notice of appeal. On February 3, 2016, the court issued a concise statement order pursuant to Pa.R.A.P. 1925(b). On February 16, 2016, appellate counsel entered his appearance and contemporaneously sought an extension of time to file the 1925(b) statement. The trial court granted the extension on February 24, 2016.

On March 18, 2016, this Court quashed the direct appeal due to Appellant's failure to file a docketing statement. *See* Order, 150 MDA 2016, dated 3/18/2016; *see also* Pa.R.A.P. 3517. On May 5, 2016, Appellant's appellate rights were reinstated *nunc pro tunc*. Thereafter, Appellant timely filed a court-ordered 1925(b) statement. The trial court filed a responsive opinion, noting that Appellant's concise statement raised more than forty allegations of error. *See* Trial Ct. 1925(a) Op. (TCO), 6/30/2016, 6-7. The trial court reorganized these to facilitate its review, given the "the volume of [Appellant's] complaints and the vague and sometimes repetitive nature [of] her not so [c]oncise [s]tatement[.]" *Id.* at 7.

On appeal, Appellant raises the following issues:

1. [Appellant] was precluded from presenting evidence of another's motive, of the [Victim]'s abuse, and of her significant health issues that would have made it physically impossible to perform the acts required to commit the crime as alleged by the government. Did these exclusions violate her right to present a complete defense?

2. By saying to the jury before the witness testified "I don't think it necessarily rebuts anything," did the trial court improperly invade[] the province of the jury by commenting of the weight

to give a defense witness' testimony? Is this especially so when this witness was called to directly rebut the government's theory of motive? Did these inappropriate comments violate [Appellant]'s right to a fair and impartial trial?

3. A corporal was permitted to testify to his opinion, because of his experience as a police officer, that he believed that a certain set of yellow cleaning gloves found in the kitchen of the [Victim]'s house and later found to have [Appellant's] DNA in them were used to move a body from outside to inside the house. Was he testifying as an expert or is that the type of knowledge and science so ordinary that "everyone knows it"?

4. After a sequestration order was issued for all witnesses, was it permissible for the trial court to do absolutely nothing when two witnesses, who provided a bold, public admission of the murder made by [Appellant], were caught violating that order (with one admitting to it) in giving the other a "heads up" as to what he was going to be "quizzed" about by the defense?

5. Was it error for the trial court to read, as a non-responsive answer to a jury question, the criminal information as a fact (not as an allegation) prefaced by "attention-getting words" of "in order to avoid any confusion about the charges in this case I am going to read the following to you" and then after the reading of the criminal information, the words "That is all I have to say on that issue. Again, I hope it [clarifies] the issues for you."?

Appellant's Br. at 5-7 (suggested answers omitted).

First, Appellant contends that her due process rights were violated when she was not permitted to present a complete defense due to evidentiary rulings of the trial court. *See* Appellant's Br. at 30-31. Appellant maintains that the court erred in excluding the following: (A) evidence of Appellant's physical ailments to rebut the theory that she was physically capable of shooting a rifle or dragging the Victim's 200-pound body; (B) evidence of the Victim's domestic abuse to rebut the theory that the Victim was afraid of

Appellant; (C) evidence of the Victim's drug use to suggest that others may have had a motive to kill the Victim; and (D) proffered testimony of two witnesses to establish that her Father had an independent motive against the Victim based on the alleged domestic abuse. *See id.* at 30. In her reply brief, Appellant concedes that the trial court's rulings were based upon established evidentiary rules. *See* Appellant's Reply Br. at 1. However, she maintains that the court applied the rules in a "mechanical" fashion that deprived her of due process and the right to present a complete defense pursuant to the guarantees of the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment. *See id.* at 1-2; *see also* Appellant's Br. at 34 (relying on *Holmes v. South Carolina*, 547 U.S. 319, 324-326 (2006)). Appellant maintains that the combination of adverse rulings cumulatively had an impact on her ability to present a full and complete defense, and constitutes the denial of a trial in accord with fundamental standards of due process. *Id.* at 31-35 (relying on *Holmes,* 547 U.S. at 324-25; *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).

Our standard of review is as follows:

> The admissibility of evidence is within the sound discretion of the trial court, and this Court will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (internal citations omitted). "A defendant has a fundamental right to present evidence provided that the evidence is relevant and not subject to exclusion under one of our established evidentiary rules." *Commonwealth v. McGowan*, 635 A.2d 113, 115 (Pa. 1993) (citation omitted). "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. Relevant evidence "tends to prove or disprove some material fact, or tends to make a fact at issue more or less probable." *Commonwealth v. Patterson*, 91 A.3d 55, 71 (Pa. 2014) (citing *McGowan*, 635 A.2d at 115); *see also* Pa.R.E. 401 (defining relevant evidence)). The Supreme Court of the United States recognizes:

> [W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. [T]he Constitution permits judges to exclude evidence that is repetitive ..., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

*Holmes*, 547 U.S. at 326-37 (internal citations and quotation marks omitted).

First, Appellant claims that the court erred in excluding evidence of her severe diabetes and other health issues. *See* Appellant's Br. at 35. Appellant contends that this evidence was relevant for the factfinder to determine that she was physically incapable of shooting the Victim with a sniper rifle or dragging his 200-pound body into the house. *See id.* at 35-38. Appellant claims that such evidence would have rebutted the Commonwealth's twelve witnesses who testified that the Victim was afraid of her.

- 10 -

In response, the Commonwealth maintains that it "has never argued that [Appellant] fired the shot from the sniper's nest or that she drug [sic] [the Victim's] body into the house by herself." **See** Commonwealth's Br. at 29. The Commonwealth's theory of the case was that Appellant was engaged in a conspiracy to commit the murder. "It is well-established … that a defendant who was not a principal actor in committing the crime, may nevertheless be liable for the crime if [she] was an accomplice of a principal actor." **Commonwealth v. Murphy**, 884 A.2d 1228, 1234 (Pa. 2004) (citing 18 Pa.C.S. § 306).

Here, the trial court found Appellant's physical health irrelevant to rebut the Commonwealth's theory of the case that Appellant's Father or another co-conspirator fired the shot from a sniper's nest. TCO at 14-15. The court opined that the "purported evidence was loaded with the potential for unfair prejudice having the tendency to elicit sympathy for [Appellant]." **Id.** at 15. Further, the court found Appellant's physical ailments "irrelevant to the issues properly being tried before the jury and likely to unfairly prejudice the Commonwealth." **Id.**

It was within the province of the trial judge to exclude Appellant's health issues on the basis of irrelevancy and unfair prejudice. **See Holmes,** 547 U.S. at 326-37; **see also** Pa.R.E. 403. We discern no abuse of discretion in that regard.

Next, Appellant challenges the preclusion of evidence of the Victim's alleged abuse and drug use. As both constitute character evidence, we address these two claims together. Under the Pennsylvania Rules of Evidence, character evidence is governed by Rule 404, which provides:

**Rule 404. Character Evidence; Crimes or Other Acts**

**(a) Character Evidence.**

*(1) Prohibited Uses.* Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

*(2) Exceptions for a Defendant or Victim in a Criminal Case.* The following exceptions apply in a criminal case:

(A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

(B) subject to limitations imposed by statute a defendant may offer evidence of an **alleged victim's pertinent trait**, and if the evidence is admitted the prosecutor may:

(i) offer evidence to rebut it; and

(ii) offer evidence of the defendant's same trait; and

(C) in a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

Pa.R.E. 404 (emphasis added). "[S]pecific instances of a victim's prior conduct are admissible to show a victim's character trait only if the trait in question is probative of an element of a crime or a defense." *Commonwealth v. Minich*, 4 A.3d 1063, 1071 (Pa. Super. 2010). Under Rule 404(2)(B), evidence of "the alleged victim's pertinent trait" is "limited to a character trait

of the victim that is relevant to the crime or defense at issue in the case."

**Minich**, 4 A.3d at 1072. "[C]riminal defendants asserting self-defense may introduce evidence of a victim's prior conduct tending to establish the victim's violent propensities." **Id.**; **see also Commonwealth v. Miller**, 634 A.2d 614, 622 (Pa. Super. 1993) (where self-defense was properly at issue in the case, then expert testimony regarding "battered woman syndrome" was relevant to prove the defendant's state of mind as it relates to an element of a theory of self-defense).

The trial court found that neither the Victim's alleged abuse nor his drug use were relevant to any crime or defense asserted in the case. TCO at 7. The court determined that the evidence was unfairly prejudicial. **See id.** The court notes that Appellant had ample opportunity to effectively cross-examine witnesses and introduce some of the Victim's abusive conduct. TCO at 9-10.

As Appellant did not raise self-defense in this case, it was within the court's discretion to exclude evidence of the Victim's bad character traits because such evidence was not pertinent to any crime or defense being raised. **See Minich, supra**. Moreover, the trial court concluded that the Victim's drug use "constituted nothing more than speculation." TCO at 13 (citing **Commonwealth v. Williams**, 720 A.2d 678, 686 (Pa. 1998) (noting that it was proper to exclude evidence that another person had a motive to kill because the evidence was speculative)). Finally, the trial court found that the probative value of the evidence did not outweigh the potential for unfair

prejudice. **See** Pa.R.E. 404(b)(2). We discern no abuse of the court's discretion.

Next, Appellant contends that the court erroneously precluded her from presenting so-called "dad witnesses" to testify that her Father had an independent motive to kill the victim based on his knowledge of abuse. Appellant's Br. at 40, 46. Defense counsel proffered that these witnesses would have said that her Father had an independent motive to be upset with the Victim because of the alleged domestic abuse by the Victim against Appellant. She proposed testimony of a prison guard and inmate regarding conversations that they had with her Father while he was in prison circa 2007, 2008, and 2009. **See** N.T., 11/16/2015, at 223. Appellant sought to introduce this testimony under the coconspirator exception to the rule against hearsay, **see** Pa.R.E. 803(25)(E), or alternatively, under the state-of-mind exception, **see** Pa.R.E. 803(3). **See** Appellant's Br. at 44.

The trial court opined that the proffered testimony was "pure hearsay" and inadmissible. TCO at 16. We agree. "'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801. "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. The proffered statements are clearly hearsay

because they were out-of-court statements and were offered to prove that her Father had an independent motive to kill the victim.

Appellant's argument is unpersuasive. In order for the coconspirator exception to apply, "the existence of a conspiracy between the declarant and the defendant must be demonstrated by a preponderance of the evidence; the statements must be shown to have been made during the course of the conspiracy; and they must have been made in furtherance of the common design." *Commonwealth v. Johnson*, 838 A.2d 663, 674 (Pa. 2003) (citation omitted). Thus, first and foremost, in order for this exception to apply, Appellant would be required to concede that she participated in a conspiracy with her Father, and therefore, his statements would be attributable to her. There was no admission of conspiracy by Appellant. Accordingly, the coconspirator exception is inapplicable.

Although the defense concedes that the proffered evidence was hearsay, Appellant maintains that it should have been permitted to afford Appellant her right to present a defense. *See* Appellant's Br. at 40-41. At trial, Appellant also argued that the statements should be admitted under the state of mind exception, which provides an exception for:

> A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3). Appellant's argument is without merit.

- 15 -

"An accused has a fundamental right to present evidence so long as the evidence is relevant and not excluded by an established evidentiary rule." *Commonwealth v. Ward*, 605 A.2d 796, 797 (Pa. 1992) (citation omitted). Our Rules are clear that hearsay is inadmissible unless a recognized exception applies. *See* Pa.R.E. 802. Here, the trial court ruled that these statements were hearsay and properly deemed inadmissible because they were irrelevant. *See* TCO at 16-18.[4] We agree.

In her second issue, Appellant seeks a new trial based on the trial judge's prejudicial commentary during the testimony of defense witness Dale Scott Jones. At issue is the following exchange:

> Q.   Mr. Jones, in the year 2008 and the year 2009, did you have a romantic relationship with [Appellant]?
>
> A.   I believe I had a wonderful relationship in both of those years, yes.
>
> Q.   And how often would you see [Appellant] during the course of those years within the terms of that romantic relationship?
>
> A.   There's really – occasionally, I was in the Philadelphia area, [Appellant] was working in that area from time to time at hospitals, she represented nurses there. So it was occasional dinners. [Appellant] was very involved with children and so she was not --
>
> D.A.:  Your Honor, if I can interpose an objection and perhaps I should have asked for an offer of proof. I'm not sure what relevance this has to the underlying charges.

---

[4] Here, the trial court does not specifically address whether the state of mind exception applied to a statement of Appellant's coconspirator.

- 16 -

Defense: It's very relevant, Your Honor, because the Commonwealth has alleged that my client has suggested to individuals if she can't have [the Victim], nobody can. This demonstrates that she's dating other individuals that would rebut that idea.

**COURT:   I don't think it necessarily rebuts anything.**

Defense:   I guess that's for the panel, Your Honor, respectfully.

COURT:  Yes, it is for the panel, so I'll allow the questioning to go on.

N.T., 11/18/2015, at 107-110 (emphasis added).[5]

Appellant contends that the judge's commentary (in bold above) invaded the province of the jury by suggesting the proper weight to accord to Mr. Jones' testimony, thus violating Appellant's right to a fair and impartial trial. Appellant's Br. at 50 (relying on **U.S. v. Olgin**, 745 F.2d 263, 269 (3d Cir. 1984) (considering the following factors in evaluating whether the court's comment required a new trial: "materiality of the comment, its emphatic overbearing nature, the efficacy of any curative instruction, and the prejudicial effect of the comment in light of the jury instruction as a whole.")). Appellant also complains that the court failed to issue a curative instruction to remedy

_____

[5] According to Appellant, "this evidence would have, at the very least, weakened the government's motive and possibly could have destroyed it…. Although the testimony was ultimately allowed, [Appellant argues that it] was condemned prior to its presentation by this authoritative pre-judgment from the bench." *Appellant's Br.* at 50-51 (citing in support **Commonwealth v. Nicholson**, 454 A.2d 581 (Pa. Super. 1982)).

its prejudicial remark. **See id.** at 58; Appellant's Reply Br. at 5. Appellant's argument is devoid of merit.

Appellant failed to preserve this issue by making an objection. Further, Appellant requested no curative instruction. Therefore, we find that the issue is waived. No relief is due.

Third, Appellant contends that the court erred in overruling her objection to the Corporal's testimony regarding the yellow, cleaning gloves recovered from the scene of the murder. According to Appellant, this testimony constituted an unqualified, expert opinion and exceeded the scope of layperson testimony under P.R.E. 701. **See** Appellant's Br. at 63-69; **see also** Pa.R.E. 702. Further, Appellant claims that this admission was not harmless error. **Id.** at 68 (citing in support **Commonwealth v. Brennan**, 696 A.2d 1201, 1203 (Pa. Super. 1997)).

Pa.R.E. 701 allows "testimony by a lay witness in the form of an opinion, where the opinion is (1) rationally based on the perception of the witness and (2) helpful to the determination of a fact in issue." **Commonwealth v. Yedinak**, 676 A.2d 1217, 1221 (Pa. Super. 1996). Police officers are permitted to testify to what they observe during the course of an investigation and how their observations led to their conclusions. **See, e.g., Commonwealth v. Berry**, --- A.3d ---, 2017 PA Super 282, at *3 (filed Aug. 31, 2017).

As an initial matter, Appellant mischaracterizes the Corporal's testimony. Appellant baldly asserts that the Corporal testified that Appellant used the cleaning gloves "to drag the decedent's body into the house." Appellant's Br. at 66. Upon close inspection, however, the certified record and the contents of the trial transcript do not support Appellant's assertion.

> D.A.: Did the fact that the victim had ended up in an unnatural position and your finding the blood, did that have any connection in your mind?
>
> Corporal: In my mind it does. When I see that these cleaning gloves are away from the victim in the kitchen, the thought obviously, were these gloves worn by anybody? Were they worn to drag the victim in? Because his body was, from what I am seeing was removed from the outside, because the initial blood letting event occurred outside the residence. He is now inside. Obviously, the bod[y] got inside somehow. So I believe he is pulled in. So I believe the gloves… [Objection]

*Id.* at 16-17. Notably, the Corporal did not testify at any point that *Appellant* used the yellow, cleaning gloves to drag the body.

Next, the Commonwealth asked the Corporal to explain several photographs that he took of the crime scene. He described photographs showing how the Victim was positioned. **See** N.T., 11/11/2015, at 24. He observed that the Victim's arms were up with his legs pointed toward the garage. **Id.** He also described areas of pooled blood near the body. **Id.** at 25. The Corporal described the photographs of the kitchen and stated his lay opinion that things seemed out of place, with "stuff scattered about," and "we can see on the floor, there is a yellow cleaning glove which just doesn't fit in

with what I am seeing throughout the residence." *Id.* at 26. Specifically, he described where he found a yellow, cleaning glove on the floor of the kitchen. *Id.* at 26. A second yellow glove was found in the sink. *Id.* at 39.

Substantively, we agree with the trial court that the Corporal's testimony, explaining photographs that he took of the body and the gloves, was rationally based on his perception. *See* TCO at 42. Combined with forensic expert testimony confirming Appellant's DNA on the gloves, the Corporal's testimony may have given rise to an *inference* that Appellant did drag the Victim's body into the house. However, the Corporal's testimony was based on his experience as a police officer and what he directly observed. The testimony was helpful for the factfinder to interpret the evidence. This does not exceed the scope of layperson testimony under Pa.R.E. 701. *See Berry, supra*, at *4. Whether or not Appellant dragged the Victim's body into the house was a matter relating to weight and credibility properly reserved for the jury as factfinder. *See id.* Accordingly, Appellant's argument is without merit. We discern no error or abuse of discretion.

Fourth, Appellant contends that two prosecution witnesses, Derk Reed and Brian Wawroski, violated the court's sequestration order. Appellant claims this was a serious violation intended to shape the witness's testimony. *See* Appellant's Br. at 73-74 (citing in support *Commonwealth v. Smith*, 346 A.2d 757, 760 (Pa. 1975)). Appellant maintains that she is entitled to a new

trial because the violation influenced the jury and the outcome of the trial.

*Id*. at 75.  We apply the following legal principles.

> The selection of a remedy for the violation of a sequestration order is within the sound discretion of the trial court.  In exercising its discretion, the trial court should consider the seriousness of the violation, its impact on the testimony of the witness, and its probable impact on the outcome of the trial.  ***We will disturb the trial court's exercise of its discretion only if there is no reasonable ground for the action taken.***

*Smith*, 346 A.2d at 760 (internal citations omitted) (emphasis added); *see also* Pa.R.E. 615.

The trial court issued a sequestration order in this case.  *See* N.T., 11/10/2015 at 27.  On the sixth day of trial, the Commonwealth's witness Derk Reed testified about a conversation he had with Appellant while standing in the end zone during a kids' football game on September 7, 2012.  N.T., 11/17/2015, at 100, 107.  Reed testified as follows:

> D.A.:  Confine yourself to exactly what you said as you recall and how [Appellant] was responding.
>
> Reed:  Well, she was mad.  And, as I started pushing harder on the fires…. [t]hen she started back and she said 'You know, your home will burn, too.'  And I am like 'Are you kidding me?'  Then she said, you, know, 'Bo will find you.'  I am looking at her and the thing she said to me was disturbing, for two parts.  I will say the first part of what she said and I will explain the disturbing part when we were there.  [Appellant] made the comment to me, nastiest, craziest voice you could ever hear, she looked at me and said "I am going to tell you right now, the last thing [the Victim] saw when he was laying on that ground looking up was me."
>
> …
>
> And I was like in shock…

- 21 -

*Id.* at 108-109. On cross-examination, defense counsel questioned Reed about the noise level at the game, suggesting that Reed misheard Appellant. *Id.* at 118-119. Following cross-examination, the court adjourned for a lunch recess.

Immediately after lunch, the Commonwealth called Brian Wawroski who testified as follows, in relevant part:

> Q. I want to turn your attention to September 7th of 2012. Do you recall where you were that evening?
>
> A. Yeah, I believe we were talking about the football game, yep.
>
> Q. Where were you, Sir?
>
> A. I was in the end zone where most of the parents and families that know each other, we gather in the end zone. **It is quieter down there.** You don't have all the band and noise and what have you up in the stands. And it is a place that we, you know, talk.

N.T., 11/17/2015, at 130-131 (emphasis added).

On cross-examination, defense counsel asked Wawroski if he met with Mr. Reed during the lunch recess. *Id.* at 137. Wawroski admitted that he walked across the street to Reed's office and briefly discussed how Reed's testimony went, by asking him "how did it go." *Id.* Reed told Wawroski that he was quizzed by the defense on the layout of the field and whether it was quiet in the end-zone. *Id.* at 138-139. Upon soliciting this testimony from Wawroski, defense counsel moved to strike the testimony and for the court to instruct "on the rules of sequestration that [the witness had] violated." *Id.* at 140. The court overruled Appellant's objection, finding that the subject of the

testimony was what was said by Appellant at the football field in Wawroski's presence. *Id.*

In its 1925(a) opinion, the trial court acknowledged that Wawroski's response on direct "was at least in part informed by what he discussed with Mr. Reed prior to testifying" and indicated a violation of the court's sequestration order had occurred. TCO at 53. However, the court found "the influence of Mr. Reed did not change [Wawroski's] testimony in any material way or prejudice [Appellant]." *Id.* at 53. Further, the court found any "impact on the witness's testimony was limited and it had no impact on the outcome of the trial." *Id.* at 54. The violation of the sequestration order "ultimately had no material impact [on] the testimony of Mr. Wawroski[], and did not deprive [Appellant] of a fair trial." *Id.* at 55.

Ultimately, the court decided not to take action based on the reasonable ground that the violation had no material impact on the testimony and no impact on the outcome of the trial. We agree. Because Appellant has failed to establish that Wawroski's testimony influenced the outcome of the trial, no relief is due. *See Stevenson, supra*. Accordingly, we decline to disturb the trial court's exercise of discretion. *Smith, supra*.

Fifth, Appellant contends that the court erred in clarifying counts 1, 2, 6, and 14 on the criminal information sheet during jury deliberation. Appellant's Br. at 76-84; *see* N.T., 11/20/2015. Appellant contends that the court's reinstruction of the jury was improper, that the "judge's last word is apt to be the decisive word." Appellant's Br. at 80 (citation omitted).

Appellant contends that the court read the criminal information as fact, and "removed from the jury their right to decide the facts and the verdict." *Id.* at 82. Appellant relies on *Commonwealth v. Archambault*, 290 A.2d 72, 75 (Pa. 1972), which states:

> An expression by the judge that in his opinion the accused is guilty leaves an indelible imprint on the minds of the jury. The jury is undoubtedly going to attribute to the judge, because of his experience in criminal cases, special expertise in determining guilt or innocence…. The influence of the trial judge on the jury is necessarily and properly of great weight, … and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.

*Commonwealth v. Archambault*, 290 A.2d 72, 75 (Pa. 1972) (internal citations and quotation marks omitted). Appellant's reliance is misplaced as the trial judge never stated an opinion that Appellant was guilty.

Our review of the record reveals that the jury deliberated for over five hours and was sent home overnight. The following day, the jury sent a message to the judge seeking written or oral clarification about specific counts. *See* N.T., 11/20/2015, at 2. Defense counsel indicated opposition to re-reading the instruction for conspiracy or accomplice liability, which the jury did not request. *Id.* at 5-6. The parties and court agreed to a re-reading of the charges for the requested counts: first-degree murder, criminal solicitation to commit murder, criminal solicitation to commit burglary, and terroristic threats. *See id.* at 7-11. For each requested count, the court restated each element that the jury must find to determine guilt. *See id*.

Following the re-reading of the four charges, the district attorney asked to convene with defense counsel at the bench for a sidebar. *Id.* at 13. The district attorney stated:

> D.A.: Your Honor, under the instruction for criminal homicide that you gave, clearly it is giving the [j]ury the impression that [Appellant] has to be present for criminal liability. As charged, we have charged her as a principal and/or accomplice. I know we have been down this road in the last day or so discussing this your honor, but giving the [j]ury half the tool, [sic] it is a charged element.
>
> COURT: Counsel, here is what I am willing to do and you are going to set the record on that request, I will read that one sentence and that is it. And I'm going to note [Appellant's] strenuous objection to that.

*Id.* at 13.

> The court then instructed the jury as follows:
>
> COURT: Ladies and gentlemen of the Jury, in order to avoid any confusion about the charges in this case I am going to read the following to you:
>
> On or about July 1st 2012, the Defendant did intentionally cause the death of Frank Spencer at 20 Fairview Drive, Hemlock Township, Columbia County. The Defendant having acted as a principal or an accomplice in bringing about [the Victim's] death by murder. That is all I have to say on that issue. Again, I hope it clarif[ies] the issues for you.
>
> Defense Counsel: Your Honor, I would ask, that that is simply the allegation.
>
> COURT: Excuse me, that is the allegation. Thank you, Counsel. You are absolutely right. That is only the allegation and as in the instruction I gave you before, charges are only allegations. They are not facts in this case unless you find from the evidence the facts that would support such an allegation to reach your conclusions. Thank you, Counsel. I appreciate that very much to

a clarify that for the Jury [sic].  Thank you.  Would you pl[e]ase
take the Jury out to convene their deliberations?

N.T., 11/19/2015, at 14.  Thereafter, Appellant moved for a mistrial, claiming that there was allegedly insurmountable prejudice resulting from re-reading the allegations to the jury when the jury did not ask for that particular information.  *Id.* at 15-16.  The court denied Appellant's motion, noting that the jury was given accurate and specific instructions that the charges were allegations for the jury to decide.  *Id.* at 15-17.  Later that morning, the jury returned a verdict of guilty on all counts.

Here, Appellant argues that the court proceeded to read the allegations from the criminal information sheet without specifying that they were merely allegations.  Appellant's Reply Br. at 8.  However, upon review of the record, we note that Appellant requested a curative instruction immediately.  In the section quoted above, the trial court clearly clarified to the jury that it was reading from the Commonwealth's allegations.

Appellant suggests that the judge's words influenced the outcome of the trial.  Appellant's Br. at 83-84.  However, as noted by the court, the "record plainly indicates that the jury was instructed adequately and in accordance with the law."  TCO at 47.  Further, the court reminded the jury that it was their duty to "find from the evidence the facts that would support such an allegation to reach [its] conclusions."  *See* N.T. at 14.  Accordingly, we discern no error.  No relief is due.

Judgment of sentence affirmed.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/11/2018